Case number 23-1134 et al., Capital Power Corporation et al. Petitioners v. Federal Energy Regulatory Commission. Mr. Theise for the petitioners, Ms. Becella for the respondents, Ms. Warren for the interveners for the respondents. Good morning, James Theise on behalf of the independent generators. FERC approved a proposal by the transmission owners that suddenly and comprehensively eliminated those owners' own obligation to pay for reactive power within MISO. That had the effect of immediately wiping out approximately $220 million in rates that independent generators had previously filed with FERC. There are many flaws in FERC's orders, but today I'd like to focus on two of them. First, FERC erred in allowing the transmission owners, who are again customers of reactive power, to immediately end reactive power compensation by a filing under Section 205 of the Federal Power Act. In 2010, FERC recognized that although a Section 205 filing could change Schedule II for newly connecting generators to the grid, generators should continue to be paid under their existing filed rates absent a Section 206 filing, eliminating them. FERC has now flip-flopped on that position, but its original explanation was the correct one. FERC should not have permitted transmission owners to use the expedient of a Section 205 filing to accomplish Section 206's purposes. How do you distinguish our decision in Dynagy, which seemed to suggest it was fine to proceed under 205? Well, in Dynagy, Your Honor, that dealt with a specific issue, which was, do the transmission owners have the right under the, essentially, a settlement agreement between MISO and the transmission owners to make a Schedule II filing? That did not answer the separate statutory question of whether doing so could have the effect of eliminating... Discussed that they proceeded under 205. Correct, Your Honor. Discussed that and that they could go forward. They could go forward to file a new Schedule II filing under Section 205 per their contractual arrangement. But I think what's critical and what's clear from both the underlying FERC order in that case, as well as the briefing that FERC filed in this court, is FERC said that even though you could make a new Schedule II filing pursuant to Schedule 205, that would not eliminate all the existing compensation that generators who had already filed 205 rates of their own for annual cost-based reactive power revenue. That did not eliminate or abrogate those going forward. The only way to eliminate those or abrogate those going forward is through a Section 206 filing. So even if the Commission is correct that the transmission owners could make a 205 filing to change Schedule II, and we have objections to that, including just in reasonableness grounds, but assuming that's the case, that would only apply to newly interconnected generators. It should not apply to generators who had already filed 205 rates with FERC. When you file a 205 rate, how long does it last? Do you send it annually or would it last perpetuity? Well, these are annual cost-based revenue requirements. It's essentially... It would last a year at most before they would be filing a new one. No, they remain on file until they're changed or until they're canceled. In fact, ordinarily, when a generator no longer is collecting their rates, they're supposed to file a Notice of Cancellation with FERC, because under the Filed Rate Doctrine, essentially, generators are entitled to charge the rates that are actually on file with the Commission. So it's not the case. How would they ever change? It would only be new generators, because obviously no one's... Even if it's not making as much money as they would like to, it's more money than nothing. So those rates are going to sit there forever. So these generators will be locked in to get paid forever? Not at all, Your Honor. FERC itself, through a Section 206 filing, or any complainant could file with FERC proceeding under Section 206 to say the rates that are currently on file are unjust and unreasonable, and here is a new just and reasonable rate that should replace it. And again, this was FERC's own position before this Court in 2010. They don't actually dispute that this was. They simply changed their mind about whether that was the proper result. But it's very clear that FERC agreed with this theory. And in fact, they did so, importantly, because the generators in that case were saying, this new Schedule 2A that you're creating, which does the same thing as the limiting Schedule 2 in our case, the Schedule 2A in that 2010 case essentially said, going forward, transmission generators no longer have to pay compensation. So it's really an on-point decision, almost the exact same thing, other than the Schedule 2A versus just eliminating Schedule 2 altogether. What FERC said, the generators in that case said, this is unduly discriminatory because you're essentially allowing our rates to be canceled through a 205 filing. What FERC said in its brief to this Court was, no, don't worry, your existing rates are going to remain on file because there's no 206 filing. And I think what's really especially notable in that case, Your Honor, is that in doing so, FERC actually forced MISO to change a prohibition in Schedule 2A that had said, going forward, anyone who's adopted Schedule 2A will no longer receive compensation. And FERC said, no, you can't do that because that would allow Section 205 to accomplish Section 206's purposes. So we'll approve your change in Schedule 2 for newly interconnected generators on the condition that existing generators are entitled to compensation until either FERC or a complainant comes forward with a Section 206 filing to eliminate those filed rates. Do transmission owners have a right to file, make 205 filings? I think this Court in Dynegy said they do. Sure. So, I mean, it's just a very odd system to imagine both sides, both parties to the transaction have 205 rights and what, it's a race to FERC. Whoever files first is the presumption subject only to a 206 override. I don't think that's exactly right, Your Honor. The way I'm thinking about this case, at least, and I think it's somewhat complicated. So, you know, I think there could be some reasonable grounds for disagreement. But the way I understand it is essentially MISO has the right to amend its own tariff. There's the MISO tariff and the schedules attached to it. Schedule 2 governs reactive power. So MISO has the right to change Schedule 2. And if you look at the record at JA23-36, it shows the transmission owners filing and it shows what Schedule 2 used to look like. It used to have several long schedules or several long provisions that calculated, explained how to calculate reactive power rates and also how those costs would be passed along to transmission owners and other transmission service customers. So the way I think about it is that MISO has the right to revise Schedule 2. If they want to tweak the formula, for example, if they want to say costs are going to be passed through a slightly different way. MISO also has the right to share that filing right with transmission owners. And that's what they did. And that's what this Court actually held in Dynegy. What I think they don't have the right to do is to take a step under their own Section 205 rights that would abrogate, undermine, undercut, eliminate the rights of the independent generators. Suppose they had just filed first. They just filed and said our rate for reactive power is zero. If they had done that, it would, then we would be, if they had done that before anyone, before any independent generators had filed their own revenue requirement. So, in that case, that would have solved the 205-206 objection we're making now. And we would simply be arguing that that is not just and reasonable, which is the second point I was going to get to today. But obviously, that's not what happened here. No, I know, but it just seems like an odd circumstance. I mean, usually the 205 filer is the transmission owner, which is the regulated entity. And it's everything they do is jurisdictional because FERC can regulate transmission. But I think, yeah, I think there's a number of 205 rights. So, I mean, if you had to pick between who's the more plausible 205 filer, it's the transmission owner. Well, I don't think so. The generator who's like may not even be a public utility in your capacity as a generator. Well, I think there are utilities under the Federal Power Act, Your Honor. I think there's multiple different, it's a little confusing because there's multiple different 205 filing rights at stake. The generators are utilities. They have 205 rights to file rates with FERC. They might have 205 filing rights to the extent they're selling electricity interstate in a wholesale market. But if we're just talking about the point of interconnection, right, the line between generating and transmitting, the statute says FERC has control over the transmission, does not have control over the generation. Well, to be clear, Your Honor, you know, I don't think there's any dispute in this case that independent generators had their own Section 205 rights to file for reactive power compensation. And, in fact, if you look at, again, JA2336, the old Schedule 2, before essentially the transmission owners filed a new one that lopped off all the provisions that talked about calculating rates and passing on costs, said very explicitly that the generators possess the unilateral right under Section 205 of the Federal Power Act to file, to establish, or revise its annual cost-based revenue requirements. I'm sorry, where's that? That's page JA51. What document? That is the transmission owners filing. It's at the beginning of our JA. It's JA51. It's in the stricken out section. But, as you can see, there's two attachments to the transmission owners filing. That's in Schedule 2, right? Right. But all I'm saying is that this affirms, until December 2022, this affirmed that they had the unilateral right to file under Section 205 for reactive power requirements. The right to make those revenue filings seems to be derivative of their tariff, which they filed under Section 205. To me, this just reaffirms the statutory right. This was the state of play in MISO for 20 years prior to this recent filing. And this basically said that, I mean, again, this did not grant us Section 205 rights to begin with. Generators, like other utilities, like MISO itself, has the right to revise its tariff. Transmission owners have the right to file 205 to establish their own rights. Each party has their own rates. And I think part of the confusion in this case is, again, what MISO was doing was essentially revising a schedule that established the rate calculation mechanisms. But pursuant to that, approximately 400 generators filed annual cost-based revenue requirements with FERC. Those revenue requirements are sitting filed with FERC to this day. And they've just become vestigial, essentially, because FERC has eliminated them. And I point you to the actual language of Section 206, which says it permits FERC to change a rate that is demanded, observed, charged, or collected. Demanded, observed, charged, or collected. So it doesn't speak only in terms of any rate that's on file. It can change a filed rate. It speaks more broadly to that. Anything demanded, observed, charged, or collected. So the idea that FERC could change one of our rates that has been demanded, observed, charged, or collected via a 205 filing seems to conflict directly with Section 206's guarantee. I'd also point you to one case in this court, Your Honor. The Chevron Texaco. We couldn't find any case that's actually exactly on point to this case, partly because we think it is an unprecedented theory from the other side. It's extraordinary. They're saying because there's no longer a cross-reference, your filed rates become meaningless. They don't sign any authority for that. The closest we found is the Chevron Texaco case. It's a D.C. circuit case from 2004. We cited it on page 8 of our brief. And what that court said, again, it's not totally factually analogous, but I think the principle is important. It said the precise question is whether under Section 205 the commission could reject the pipelines correct. This is an NGA case, so it's technically the parallel provision of the NGA. But it said the precise question is whether the commission could reject the pipelines correctly calculated surcharge filing because the commission no longer regarded the method of calculation to be just and reasonable. So that was a case involving the change of a rate mechanism, like Schedule 2, and it said essentially if we determine that the rate mechanism is unjust and reasonable, does that mean that we should start rejecting under Section 205 equivalent new rates that are filed? And what the court said in that case was no. Even where we've determined that the calculation mechanism, i.e., Schedule 2 in this case, is unlawful, you still must use the Section 206 equivalent to change filed rates. And again, I think that case is especially important because it was the primary authority or one of the primary authorities that FERC itself cited in the 2010 proceeding when it said that the Section 205 filing in that case to change Schedule 2 did not change all the existing rates that had already been filed. That was my first point, Your Honor. I'm happy to continue answering questions about that, but I know my time is getting short, so I'm also happy to talk about the fact that we don't think the just and reasonable standard has been satisfied here. I think that's the other crucial error in this decision. FERC approved the transmission owner's proposal despite the fact that, as Commissioner Danley noted in dissent, the transmission owners undisputedly proffered no supporting evidence. Rather, they relied exclusively on distinguishable FERC precedent policy. And as the dissenting Commissioner noted, that gap meant that FERC simply could not know whether the proposed rate of $0 going forward for reactive power, which is a mandatory required service that FERC has repeatedly found is essential for grid reliability, should be compensated at $0. And there was substantial unrebutted evidence, I'm quoting, of the negative rate impacts that were submitted by the independent generators. So we also think there's just, even if you accept that this complied with the statutory scheme and you accept the FERC's transition, we think that issue alone, that Section 205, 206 would resolve this case, you wouldn't need to get into anything else. We agree with you about that. And if we vacate and remand, what kind of order should we give with regard to the remand? Well, Your Honor, I think if you agreed with us on 205, 206, the order could simply – We agree with you that this was not just in reason. We disagree with you about whether it could be filed. We disagree with you about whether it was just in reason. Well, typically in that circumstance, Your Honor, I think you would, in terms of the specific language – This is a very friendly question. Yeah, I hear you. We would vacate. And we would remand. There's some talk about a fuller hearing and the alternative. And I guess it hasn't always been clear to me why that's an alternative and not just part of what the remand order would look like. But I'm just asking for your help. Right, of course. Well, if you could issue a remand order, what should we tell folks? You determined that there was insufficient evidence, then I would vacate, remand to the agency to conduct further proceedings. I think a hearing would be absolutely appropriate in the circumstance, considering it's ultimately a substantial evidence question. Is $0 for newly interconnected generators going forward at a just and reasonable rate? And that question ultimately goes to looking at cost plus a reasonable rate of return, I think, is the classic description. We could just order further proceedings, and then FERC could choose to either conduct more of an evidentiary hearing or to decide to try again with the evidence that's in front of it, and that may or may not work out well for FERC. Yeah, well, I would suggest that, yes, if you were to remand on the ground that it's not just unreasonable, that the language should make clear that they require evidence going forward. So I would think that they would not rely on the same record, but instead would either conduct a hearing or conduct further paper proceedings that required actual evidentiary submissions by the transmission honors and not simply as— That's necessary because your point is not just that FERC did not reasonably explain its decision based on the evidence in front of it, but your position is there was no way FERC could reasonably explain this decision when they were limited by the evidence. That's right, and that's what Commissioner Danley held, Your Honor, or wrote in dissent. He said, we simply cannot know. And he said he even took the position that it's possible that $0 is an appropriate rate going forward. We strongly disagree with that. Again, it's a required critical service. We think there are statutory and constitutional questions to say that we're being required to perform a service that we're not doing for our own benefit but for the benefit of the grid. Don't a lot of generators do it outside of MISA? Lots of generators do, but again, I think it's a fairly extraordinary theory for FERC to say, we're requiring you to provide this service, but we're not going to pay you for it. That's unusual in FERC. Most of the time, most required services, every other ancillary service that I'm aware of, FERC gives payment for it because it's required. If FERC doesn't want to pay for it, they can make it voluntary, but they won't do that because it is so important. On this specific question of compensation, it's MISA and the recent task that has been the out. Well, I think there are, I think I read in the record, there's six RTOs or ISOs, four of them until this latest order provided compensation. Now, it's three and three. So, it's an outlier. In fact, it's the other way around. But I will also say that in those other circumstances, which I think that Commissioner Dailing's dissent noted were clearly distinguishable, my understanding is that this issue has never been raised, and I don't think FERC points to this issue being raised. There was, again, it was very different circumstances, not a circumstance where hundreds of generators had received hundreds of millions of dollars for 20 plus years and then with a simple expedient of a Section 205 filing, wiping it all away and backdating it to the day after the filing was made. Why can't the agency rely to some extent on their past views and past practice and past experience with this issue? It's not as if this is coming up for the first time. They've been saying for over 20 years that this reactive power within the dead zone, within the normal zone, shouldn't be compensated, except as necessary to ensure equal treatment between affiliated and unaffiliated generators. Your Honor, to some extent, Commission, of course, can rely on its prior precedent. And in fact, the California Public Utilities Commission, I think, says that. But I think that's an important case for this proposition, because what the California Public Utilities case, which is a 2021 case, said was, you're allowed to rely on your prior decision to the extent that they are factually the same and don't have relevant differences. But in a situation where there are relevant differences, it's not sufficient to say, well, we've decided this in these distinguishable circumstances and therefore we have no obligation to come forward with substantial evidence. What's the relevant difference other than that generators have been taking advantage of this to get a payment that, under the logic of Order 2003, they probably shouldn't be getting? Well, I think, first of all, there's some relevant differences, which is that there has been 20 years of experience with this. I do think that changes things. And that changes things both from a reliance standpoint. I mean, a lot of these generators have entered into 10, 15-year power purchase agreements that relied on a separate stream of compensation that has now been taken away. There's also, and just in general, set rates and done other things without any longer any clear mechanism for recovering it. There's other questions that have been raised in the record. Again, all these questions were raised on an evidentiary submission that was one-sided, according to Commissioner Danley, only from the protest side. There was no evidence on the other side about things like reliability, about things like cost recovery, the ability to do that, undue discrimination. I think the intervener's brief talks a great deal about that. So I do think it's distinguishable, but I would also say, Your Honor, that essentially since the dawn of Order 2003, which if you go back and look at it, the whole analysis of this question boils down to essentially one sentence, which says because you're required to do this, we're not going to compensate you. So it was not a fully fleshed-out order even at that time. Fair enough. There's been precedent that's accreted on top, but continually, including in the proceedings below, says you can't even attack that because that's a collateral attack on our prior order. So I don't even think this issue has been fully and adequately been raised in a proceeding such as this one to say, well, wait, take a step back. Why should $0 be an appropriate rate for a service that you're requiring? It's one thing if they say it's a voluntary service, you're free to provide it or not, but if you're going to require it, how could it possibly be that $0 is an appropriate rate? So at least that should be fleshed out, Your Honor. So that's why I just don't think. Yeah, the order itself, 2003, is thin on its face, but I think the accretion – correct me if I'm wrong – I think the accretion is the justification that when you're in that normal zone, the function of the voltage support that the reactive power gives you is just to enable the power to get from the generator into the grid. And that's different from reactive power outside the zone, which serves this function of getting power through the grid. And one you think of is, you know, it's on the generator. The other really starts to look like the grid is benefiting and they should pay for it. Right. That seems like a pretty rational way of looking at the work. That, Your Honor, I think is the argument – that's the way I read the DC circuits – I'm sorry, the first brief of the DC circuit. I don't think – and we've looked – I don't think FERC made the finding that reactive power is being supplied for the generator's own benefit. We looked at the citations in the first brief to that point, and what they say is you're required to provide it. It doesn't say you're required to provide it because it serves you. It's true. It helps us get our power on the grid, but it serves a much broader reliability purpose for the entire grid. And there's a few reasons why I know that's to be the case. Number one, again, it's required. So, again, it would be surprising to me that they would not make it voluntary if it was purely for our benefit. Number two, on page 23, they say that – FERC says on page 23 of its brief that the requirement for reactive power is so grid reliability is not threatened. And that's based on, Your Honor, a long line of FERC statements in many orders. I'll point you to a couple. On JA156, there's a quotation to a FERC staff report that says generators would be unlikely to provide reactive power if it were not compensated going forward. So, again, that kind of shows that this capability of not only producing reactive power but being able to absorb it as well would not necessarily be offered as a discrete service if it were not a requirement. One other point, Order 888, which is the sort of seminal order from 1996 that FERC used to restructure the markets and required – The unbundling. Exactly, and required reactive power as a separate service. It's cited in our brief occasionally, but it says that reactive service is necessary to maintain the integrity of the transmission system. And, again, it's provided both by transmission service providers but also by generators who interconnect for their own purposes but also for broader reliability. One other point on this, and I think this is almost conclusive, FERC admits on page 38 of its brief that wind generators, renewable resources to interconnect to the grid, were not required to supply this reactive power capability service at all until 2016. So, between 2003 and 2016, wind generators had no obligation to provide this service. To me, that is conclusive proof, at least for wind generators and probably other renewable resources, this is not purely for the generator's own benefit. It's clearly for the grid's benefit. So, it's an extraordinary theory to me to say that they are requiring this service that we must provide, and we're going to give you $0 for it. And because we made the statement back in 2003 without a great deal of analysis, you're essentially stuck with it in perpetuity. We think we should be able to challenge it for purposes of this proceeding and substantial evidence is lacking to show that the proper rate going forward is $0. Let me just ask you a technical question. Sure. What is this reactive power? Is it just the same power the generators put out, but it's just steered to a different purpose, or is it some unique form of electricity? My understanding, Your Honor, and I'm not a technical expert, is that it's a different type of electricity. It's essentially reactive power is measured in voltage amperes versus real power is measured in wattage. So, wattage is actually the real power that powers devices and things like that, whereas reactive power essentially helps electricity flow throughout the grid and maintains proper voltage levels. So, it's essentially like – I mean, I know there are talks about the connection pieces, but do you have to have special equipment to generate this, or is it easily just a byproduct of ordinary generation? So, for synchronous resources, traditional thermal generating resources, coal, oil, gas, those sorts of things, it is a byproduct of the process. The same equipment creates both real power and reactive power. There's no dispute that forward. So, if it's just sort of a diversion off of your regular electricity, what do you do to make it turn into reactive power? I think it has to do – and again, I'm not a technical expert, but my understanding is it has to do with adjustments that can be made on the plant side to either absorb or produce reactive power or to maintain appropriate voltage levels throughout the grid and make sure energy is flowing smoothly and there's not blackouts. So, you didn't have to mandate that electrical power would not get diverted and you would have more electric power to put out onto the grid and that you would get compensated for? In the rare circumstance where reactive power is needed outside the dead band, we would continue to be compensated. So, I'm just talking about if, for example, if it were – I'm trying to understand if when they require this reactive power, are they taking electrical resources or power that you would otherwise be able to put into the grid and get money for? Right. So, I think the answer to that – my understanding is the answer to that is no for thermal or synchronous resources because they produce power – technically, they produce alternating current power, whereas non-synchronous resources, renewable, wind, solar, battery storage, in that case, they have to purchase special equipment to actually produce reactive power and there is an opportunity cost for producing reactive power in that the more reactive power they produce, the less real power they produce. So, there is actually a difference for that. And I think that's undisputed in the record. I think there's statements that – again, yeah, that's on page 56 or 57 that we talk about of our brief that renewable uses separate equipment and there's opportunity costs. But I think beyond that, too, it's a little misleading to even talk about incremental costs. That's what FERC wants to rely on a lot – incremental costs, fuel costs, maintenance costs, things like that. But for the past 20 years, FERC has well recognized that there are costs associated with reactive power. In fact, they have approved filings by 400 generators for $220 million in annual cost-based revenue requirements. This is detailed filings that generators make with testimony and expert analyses and data that says, here's the cost that it costs us to produce reactive power. Now, it's true, it's using the same equipment for synchronous resources, but that doesn't mean there's no cost associated with it. It just needs to be allocated between the real power you're producing and the reactive power. What are the costs that they missed? The costs that they missed? Yeah, because they talk about you got the equipment already and you're already making electricity. Well, they simply – What made up that $220 – they say it's minimal and you guys say it's $220 million. Well, FERC has said it's $220 million because, again, those are the annual cost-based revenue requirements. Those are – it determined where our costs were producing it. It was calculated using something called the AEP methodology, which basically is a FERC case-based methodology that calculates the power between reactive and real power for a particular asset. FERC now, in its brief, says, well, that's just a legal construct. Well, yes, it is a legal construct, but it's one that's been established and that FERC has accepted for 20 years, which is to say that it acknowledges that for cost-of-service rate-making, which is what ancillary services like reactive power are, you need to look at the costs for each of those services and, therefore, you should divide the cost between the real power you're creating and the reactive power, and under cost-causation principles, whereby you have to ensure that the costs you're incurring are being paid by the customers who actually use that service. That's why you have to divide it that way, because the customers of real power are different from the customers of reactive power. Real power is purchased by end users. Reactive power is purchased by transmission customers to help power move smoothly throughout the grid. There's a lot of math, but I'm still not understanding what it is that you need to get compensated for, and this is sort of essential to your takings argument and your arguments about. It's strange. They say, look, it's just this piece of equipment. You have it. There's really no other cost to this. You say $220 million. I'm trying to understand the difference of what makes up that $220 million. So it's not just a piece of equipment. It's not maintenance. No, no. It's labor. We could have used this for regular electricity. That's what I'm struggling with is the gap between the two sides. Right. So, again, I think there are some incremental costs. We'll all agree for wind and solar that Berks says there are not very many. They're separate equipment costs. But I think the broader point and the more important point is that, in general, under just and reasonable, to determine a rate is just and reasonable for cost of service rate making, you have to determine that you're recovering your costs plus a reasonable rate of return. There's something called the cost causation principle that says if you have certain costs, as discussed on 26 and 27 of our reply brief, if you have certain costs, those need to be paid by the customer who's actually taking them. So if you spend $100 million on a new, I'm making a number up, obviously, but on a new generation facility, then you need to allocate your costs of that $100 million between the real power you're producing, which might be $80 million, and the reactive power you're producing, which might be $20. Again, I'm making these up. But the reason is because then the $20 million you get is your annual cost-based revenue requirement that is passed along to the customers of that cost-based service, which in this case are the transmission customers, most of whom are the transmission owners on the other side. Any questions? Thank you very much, Tony. Thank you. We'll give you a few minutes for rebuttal. Thank you. Good morning, Your Honors. Beth Pasella for the Commission. I'm going to start with talking about the AEP methodology that Judge Millett was just asking about. The Commission explained that the AEP methodology doesn't show that there are actually any costs incurred to produce reactive power. It's simply a legal construct. It's an allocation factor that was created long ago to a portion that was created back when there wasn't unbundling and transmission and generation was all owned by the same company. And so when the Commission said it's okay to just apportion the cost of the same equipment among real and reactive power, and that's how it was done. So now we have generators who – Is FERC error in approving? It's just unreasonable all these rate filings by generators to recover these costs? I think that's something that the Commission is looking at now, and I'm – It approved all of these for – The revenue requirements under this AEP methodology it did. It approved all of them, and I didn't see anything in the record that said that they were, you know, padding the bills, that there was anything content-wise wrong about these bills, that there was anything invalid about the bills. There's no filing. There is no finding. That's the whole 205, 206 issue, that these rates that they had filed were not just and reasonable. Well, there's no finding because there didn't need to be a filing – a finding regarding that here, Your Honor. But if I could say – But they were filed. They were filed, yes. Did they not have to be just and reasonable when filed? So revenue requirements, the Commission found that they were just and reasonable at the time in light of the AEP methodology. But revenue requirements, if I could just explain. The revenue requirements, as the Commission explained that we're hearing, Order 617, Paragraph 47, Note 61, they're just an offer to sell reactive power on a generally applicable basis at a standard rate. They don't establish an obligation on any party to purchase the service. And so when they, under this AEP methodology, divided up their costs among real and reactive power, it's a fiction is what the Commission is now explaining in the orders here. It always was a fiction because it was just a legal construct how to divide things up. Now the Commission is looking at it, and it explained here – Wait, sorry. I don't understand this fiction. I assume with those rates that were on file, they couldn't have charged transmission owners a higher rate than that number. Correct? I mean, that's sort of – they had to charge – they could only charge transmission owners the rate that they filed. The rates in their revenue requirements are used as part of their cross-reference in Schedule 2 because that's the amount that Schedule 2 would use to then calculate the rate that they were paid for reactive power. They couldn't have said – once they said $100 for however many volts of reactive power, they couldn't have charged someone $200, right? No. No, it was a real, on-file FERC rate that they had to comply with. That's not a fiction. No, the fiction is how it's divided up. So you have – let's say you have $100 in costs to produce reactive power – to generate power, including producing reactive power, so the Commission found it at little or no costs. The Commission, under this AEP methodology, allowed entities to take that $100, and I'm going to obviously make this simple and say 50-50. I don't really know how the AEP methodology is kind of complicated. Let's say it's 50-50. So you tell us that half your costs are for generation of real power and half your costs are for producing reactive power. But that's not true. What the Commission explained here, based on its experience, and I understand there's no evidence in the record about this, but the Commission is allowed to, and there are many cases that say this, the Commission can rely on economic theory and predictive judgment. And the Court has completely said that time and time again. It's perfectly legitimate for the Commission to base its findings on basic economic theory and on predictive judgment, and that that satisfies substantial evidence where it has done so correctly. Economic theory, were they applying? Economic theory – They said that this doesn't cost anything when we know, at least for non-synchronous generation, they don't make this as a byproduct and they have to buy special equipment. That's not correct, Your Honor, and the Commission explained that. If you look at – if you look, for example, at the rehearing order – It's not a byproduct of what they create. It is a byproduct of what they create. They have to buy a special – I forget what they call them. It's an inverter. And the inverter is – no, as the Commission explained at the rehearing order, paragraph 30 at JAA 606, the Commission explained that they use their inverter to convert their real power to alternating current so that they can inject it onto the system. So it is a little bit different than synchronous. They don't create alternating current or – They don't, but they can't get their real power on the system unless they do this conversion. And in order to do this conversion – How did the folks do it for, like, six or seven years when they weren't required – the WIND folks, when they weren't even required to provide – The WIND folks were exempted and they didn't have to provide reactive – Okay, so then they were able to get their power – They used some other method to convert their power. Is that in the records then? I'm sorry? Is that in the records? My understanding was they were not required to provide reactive power. They were not. Reactive power is not required for WIND power, at least, to get onto the grid. Well, it is now. No, no. Reactive power was – Mechanically. Reactive power was. It's just other entities were providing it for them if it was needed. Why wouldn't it just be a bit of a byproduct of their own power? Actually, I take that back. I'm incorrect about that. If there was a study to show that reactive power was needed for that particular WIND generator to get their power onto the system, then they did have to provide reactive power. It was just very expensive. So, they could provide reactive power. It was all based on the cost. And then, since in 2016, the commission determined that technology had changed. It's no longer expensive for WIND power to use an inverter. They use inverters now, and they've been using them just naturally. WIND generators just use inverters to create real power and to produce reactive power. So, they're no longer exempted. I understand. But it just sounds like this is more complex than simply saying there's no – You said it was an economic theory that FERC relied on that we're supposed to refer to. Let me try again if I can. $220 million sounds like more than minimal cost to me. Right. But again, that's a legal construct of just saying 50% here, 50% there. It was done for convenience. It wasn't a reasonable calculation. The commission – whether that's just unreasonable is something I think the commission is addressing now. You said that a couple times. It would be quite extraordinary to have done all this for so many years. Is it 400 times a year and doing it for 20 years to the tune of $200 million and then to say actually the whole time we were paying people for nothing? Well, that – so, I mean, the alternative, Your Honor, is for the commission to continue to allow people to be paid for nothing. You would have been rushing to file a 206 filing and say we've just discovered, stop the presses, this is a gigantic transfer of money to people who don't deserve it. That's as unjust and unreasonable as we could get. I don't know what to say about that, Your Honor. No one – I don't have an answer to that. The commission has done a rulemaking. Don't you have a 206 filing? We do. We have the commission's rulemaking, that Order 2023. Is it 2023? I'm sorry. There's a rulemaking. The notice of proposed rulemaking that's out there now, thank you, is pending, and the commission is addressing that on a more global basis. Here it had a Section 205 filing submitted by the transmission – submitted by the MISO and proposed by the transmission owners. And so that's what the commission had before it. And let me just explain again. When did FERC realize that this was all sort of an unjust and unreasonable transfer of funds? My guess is the realization happened a while after the notice – when the notice of inquiry was put out. So there was a notice of inquiry that came before the notice of proposed rulemaking, and the commission started rethinking it out there. When did it occur after the transmission owners filed here? I don't know the date of the notice of inquiry. It was before they filed, I guess. So – but if I can – I haven't explained, I don't think, well, the non-synchronous generating facility. Yeah, I'm sorry. Do you want to have a timeout? I will let you continue. I just want to make sure. Of course. So FERC already had a notice of inquiry out before the transmission owners filed this amendment? Is that what you're saying to me? Apparently so.  And how – It is part of the record here. It is mentioned in the record here. What is the notice of inquiry? The notice of inquiry was about whether there should be compensation for reactive power within the standard range because there is no cost. Why would that have been out when you already had Order 2003 out? That's saying you shouldn't get compensation. Oh, the point is that because under Order 2003, transmission owners had the option to pay their own or affiliated generators, and therefore, as a matter of comparability, had to also pay other generators. And the commission was questioning and is still questioning in the notice of inquiry whether anybody should get paid. And it has determined in this post-record notice of proposed rulemaking preliminarily that no one should be compensated for this. So transmission owners can't – Well, it hasn't quite determined that because it's asked for comment on – Right. That's why I say preliminarily. Well, I wouldn't say preliminarily because it says how should we even – if we were to decide that going forward the rule should be no compensation, how does one transition with these existing payment schemes? But if, as Judge Walker was saying, it turns out, as at least the rationale right here suggests, that this whole thing has been sort of a scam, that they haven't been spending a penny but collecting $220 million. I think that's the question. And I would have thought – Understanding. FERC would have jumped a lot sooner. I don't know what to tell you about that, Your Honor, other than what I'm defending here is this set of orders. And, you know, I'm not defending the post-record notice of proposed rulemaking. I know you're not doing that. It's just it feels like – I don't know what to say. There's a lot of confusing messages. I don't – I think – I'll put this on you. But from FERC, you know, you said we've got 20 years of 220 – I'm sure the numbers change, but we'll just say roughly $200 million a year in costs approved – rates approved as just and reasonable with charge and pay. Under a prior. And that happens. You have that. Then you have Order 2003 saying we don't think folks should get paid, but if you want to get paid, just make sure they get paid, too, so it's fine to keep paying this. I mean, that's what 2003 says. It's fine if you all want as long as you do it evenly to keep paying. And that's preliminarily – Then we have this going. It's nothing. It's nothing. There's no cost there to justify these expenses. That's right. Then we have an NPRM that comes out and says, well, we need to figure this out, and if we do, what do we do with existing rates, suggesting that you shouldn't sort of cut them off instantaneously as happened here. So it's just sort of a very confusing – So no one argued on this record here that it should be phased in. That's a construct from the reply brief. That was not – they never argued that it should be phased in. The reliance interest is that it shouldn't happen at all. That's their argument. And they did not reasonably rely on this. When you have – The reliance interest is as strong as it is because there's not going to be a phase-in. They never – Your Honor, I'm sorry. They never said anything about a phase-in. They never proposed a phase-in to the commission. It was never presented to the commission. I don't know what the commission would have done if they had asked for a phase-in. You were saying, like, this is just kind of like the logical implication of a different argument. And that seems like – this seems like a logical implication of their reliance argument, that I have more reliance on tariff if it's providing me, you know, $200 million last year and it's going to go to nothing this year, then I would have a reliance interest on that tariff. If, as it's phased down, 10 years from now, 20 years from now, I'm only getting $1 million. But $1 million is less reliance than $200 million. The commission's point on reliance is that it could not be reasonable, based on the longstanding rule before Order 2003, all the commission's cases, including 2003, and all the precedents since, that it said you cannot – you should not be recovering for these costs. It's for your own benefit. I understand that point. I'm not opining on its strength or its weakness. I'm just saying I think it's stretched to say that when they did make a reliance argument as front and center as they did, I think it's a stretch to then say, well, they forfeited any argument that there should be a phase-in. The reason the reliance argument is strong is because there was not a phase-in. I think that in the circumstances here, we have a Federal Power Act Section 313B requirement that you specifically raise any matters you want to present to the court on rehearing to the commission, and they've never raised this throughout the proceeding. It's just out of circumstance. The commission did not have that question before. It didn't. And so I can't tell you what the commission was – But FERC approved an overnight change. October 30th, I still have the stream of income coming. I'm making my plans. October 31st, what? And November 1st, gone? Right, $250,000 for a generator, gone? Your Honor, this is what – Within 24 hours, and so that is – don't have to look at what they raised. That is a different reliance interest for FERC to grapple with. $550,000 for 20 years, gone in 24 hours. No time to adjust time. This is what the parties – No time to deal with it. This is literally what the parties agreed to. If they entered into an interconnection agreement with something like Section 9.6.3 – That begs the question of whether they agreed that could be changed through 205 or 206, which would require FERC or the complainants to show that what they were doing was unjust and unreasonable. If their rates were unjust and reasonable, I would agree. They have no basis for relying on continuing to get unjust and unreasonable rates. But FERC's answer just assumes that not only there could be this change, but it could be done – Anytime they came up with an unjust and unreasonable number. I'm sorry, Your Honor. It's actually the protections of a 206 process. I'm sorry, Your Honor. I don't understand how that begs the question of whether it would be a 205 or 206, because what they agreed to was that their compensation would be whatever Schedule 2 says. It was dependent on that. It begs the question because that – it asks how would that number be changed under this tariff within the framework of the Commission's law? The law that governs the Commission. And that is as long as our rate is just and reasonable, it cannot be changed. But, again, a revenue requirement wasn't changed. The revenue requirements stand. They're there. And, again, these entities agreed. And I just can't emphasize that enough. Let me – if I could just take one quick moment to talk about what they agreed to. If we look at 9.6.3 and it says – it says they agreed that payments for providing reactive power within the standard range would be contingent on the contents of Tariff Schedule 2, which these MISO NTOs have the authority to change. The text is, payments for reactive power shall be pursuant to any tariff or rates schedule filed by the transmission provider. It's very plain and simple. Again, it's a backdrop of a legal system where when there's a rate on file, a rate's not just what's charged. A rate is also what is paid. A rate is on file. That's not right here. It's reasonable. It's not correct here. They started this conversation earlier with agreeing that their rates were on file and had been found to be just and reasonable by FERC. Their revenue requirements were on file. But revenue requirements – That's just and reasonable. And they were on file as just and reasonable. But the revenue requirements are just what we would like to charge – what we would like to charge, as I explained already during this argument. We would like to charge what we will charge. What we will charge. And then there's a backdrop legal system that says those don't change unless they're shown to be unjustified. And they're unchanged. Their revenue requirement is unchanged, Your Honor. What changed here is – Schedule 2 said the rates will be set to zero. That was what was found. No, not – Schedule 2 rates will be set to zero. Schedule 2 rates are set to zero, not their revenue requirements. Schedule 2 cross-references their revenue requirements because it takes the information in their revenue requirements – That sounds like a legal section. It's really not.  Will they still get $220 million a year under this decision? Or will they get zero? Well, first of all, it's not $220 million a year. The generators are a small portion of that. But whatever the number is, they will get it through other means. No, that's a separate question. So they will not get it by charging the transmission owners, as they have been for 20 years. That's because they agreed to that, Your Honor.  Because they agreed to zero. It is right. No, the revenue requirement doesn't go to zero. The rate in Schedule 2 is zero, Your Honor. And I'm sorry, I'm not explaining this well. Schedule 2, which they agreed would be the basis of their compensation. Again, payment for reactive power shall be pursuant to any tariff or rate schedule filed by the transmission provider. Which means whatever Schedule 2 says is how they will be paid. They're not. So they agreed to this. And they understood. They understood. And if they didn't, they should have. But the commission's precedent is you only have to get paid under Schedule 2 if the transmission owner is paying its own or affiliated generators. And there's case after case in which the commission allowed entities to stop paying under Schedule 2 because they were no longer paying. It allowed payments under Schedule 2 to be eliminated. Time and time again. That happened over and over again. Is there a best precedent for 205 being allowed to reduce rates to zero, to terminate charges, as intervener has said, change what is payable to generators from what's on file? What's your best case? I'm worried about tariffs being written now in a way that allow amendments. I don't understand. This is simply ‑‑ I'm sorry, Your Honor. If they waive their 205 rights. Yes. They waive their 206 rights? Well, everybody has a 206 right. I don't think you can waive your 206 right. You can waive your 205 right to make your own filings. If they waive the right, you're saying they waive the right to have their rates changed, reduced to zero. Their rates were not changed to zero. The payments that they would receive. They waive that right. That's right. They wouldn't have to proceed under 206 to modify change. That's exactly right, Your Honor. I don't see an express waiver. Normally, for waivers of legal rights, we require something more explicit than this. They agreed to this. They're not zero. Their revenue requirements may still exist to this day with the same number that they had before, Your Honor. The ability to charge these customers for this service is nullified. Only because they agreed to do so. I think we're going in circles on this. It's a critical point. Prior to this amendment, what would happen if a transmission customer didn't pay whatever this filed charge was that they had? What would have happened? If they didn't pay the Schedule II charge, because that's the thing that was paid was the Schedule II charge, not the revenue requirement. If they didn't pay this, I don't know what would happen. I mean, I'm sure there's procedures to make sure that entities pay their rates. I'm sure you go to MISO first. Yeah, I'm sure the tariff has procedures for nonpayment. But that's a Schedule II issue. Nobody was paying the revenue requirement of the generators. No one was paying that. What they were paying was a Schedule II charge. And Schedule II incorporated the information in this tariff file. Based on the revenue requirement. In part. Just divided it up amongst customers. And it is explained in the record how it's calculated. It's a whole bunch of steps and there's formulas. But it is used. They do use the revenue requirements. But it is not the charge. How much each transmission owner was going to pay. Yeah. And you're saying they waive their right to have that change. Absolutely. A sign of unjust and unreasonableness. By this language. And I'm just saying what other tariffs in the future could, say, have language in there that says whatever payments you're going to get for other services can be changed at the will of a majority. But that would never happen if entities didn't agree to that. I didn't understand that. That's what they. I mean, they. No. They didn't agree that that's what they signed up for. That's not correct, Your Honor. I think that this is truly. If I ask them, they're going to say they agree that they waive their right to any 206 protections for this change? I don't think it's the 206 issue. I think it's that they. Their argument is that it is. And you're saying that they. Oh, you mean that they waive them having to file a 206. I'm sorry. I was misunderstanding. I think. They don't think that. Well, they're arguing that now. It's unreasonable to believe that in light of the general rule, which is that you should not be paid for providing reactive powers in the standard range. And the reason for that is because there's little or no cost to doing so, which the commission explained here. It's because synchronous and non-synchronous both have to. The primary purpose of being a generator is to get your energy, real energy, onto the system. And for both synchronous and non-synchronous, the only way to get your energy onto the system is to have capital structure that will allow you to produce real power, which also, by chance, produces reactive power. There's nothing different about non-synchronous generators. The inverter that they use to be able to convert their real power to the correct, to AC instead of DC, which is what it would be, to get their real power into the system, they have to use that inverter. So it's just. Then they also have to have this inverter to the same inverter to produce reactive power. There's no difference. There's little or no cost for any of this. And they have other options to recover these costs. In Order 2003B, Kirk said it was, through Order 2003, was not affecting existing compensation arrangements. Did MESA have at that time, I think MESA was a couple years older than this, have an existing practice and schedule for compensation of reactive power? I'm sorry. So, in Order 2003B-B, which is supplemented, it says it is not affecting existing compensation arrangements. Didn't MESA have an existing compensation arrangement? So, if there were, I mean, there's no claim here that there are grandfathered compensation arrangements. Oh, whether this tariff provision, I don't know, Your Honor. I mean, no one's argued that, so it's not something I'm aware of. I just don't know. It's not part of this record. Okay. So, this is public law, 2003B. I mean, it's public record. No, I understand that. I just don't know. I don't know what agreements might have existed in MISO before Order 2003. No one's made any claims about that, so I just don't know, and it's not part of this record. If I could just take a minute, or I'll be done. I'm going to give you some wrap-up time. Thank you so much. Just one quick question.  Can you give me a sense of your point that the generators have other means of getting compensation? Of course. I mean, it seems clearly right in the abstract, right? If they can't get this compensation from the transmission owners, it's a higher cost of doing business, and either some regulator will let them pass that along, or the market will just take that into account. But what's the timeframe on that? I mean, I think the answer to what I just said was, yeah, sure, but we enter in these power contracts. I think your friend said they do this years in advance. They're locked into whatever price they're locked into. That's just a power purchase agreement. How do you solve the short-term problem, the transition problem? Well, let me say this. How do they deal with that? And I do want to answer that, and please forgive me if this frustrates you, because I am getting there, and I'm not avoiding it. They could have included something in their power purchase agreements that would have said, Schedule II now gives us compensation for this, but we understand, based on the commission's longstanding precedent, that this could change at any time, and so we want to include in these power purchase agreements a provision saying, if Schedule II compensation goes away, we want this level of compensation. So they could have done that in the first place. But to answer your question, and I'm sorry. I know. I forgot what it was. I mean, I guess that is the answer. How do they deal with the transition? Oh, in the markets. There is a transition problem. Future contracts for power 10 years from now, they're fine. Oh, yeah. Just adjust. But what do they do for the ______? They go to the markets. And the commission pointed specifically to specific tariff provisions that give them the opportunity to include these in their capacity and energy market rates. Did they just make them less competitive? No, because this is happening to everybody. No, it's not. Transmission generators can pass the cost on to their retail customers. But there are ______ up their bids at the capacity auction. So, well, that's ______. They won't be able to compete with transmission generation. So, you know, they keep saying that there's low resources in the market, so I don't understand why they think that they wouldn't be able to include these. But the commission, again, explained that they can do this and that there are plenty of generators that have to ______. I mean, independent generators, there are plenty of them that are part of the market. ______ are competing in these markets. Get to pass this cost on to retail customers. They don't. So, transmission generators don't have to ______ up their bids at the capacity markets to cover this cost. They do. So, in that way, it's not ______ option. They didn't make that argument until their reply brief, Your Honor. They never argued to the commission that this will make us less competitive, that we don't have a real opportunity. That specific argument was never ______. FERC needs to show that this is going to work to deal with this, and it's not logical. I'm no genius, but it's pretty obvious that you're going to have to do this. You're going to have to up your ______. The only way to do it is to up your bids, and it's right there in the face of the order that transmission doesn't have to do that. I'm putting two and two together. That means it's not going to be a competitive market. I understand what you're saying, Your Honor. But, again, we have the Section 313B requirement, and they did not argue to the commission ever. I can only tell you what the commission's orders say, and the commission responds. Use your words. It sounds like basic economics. I understand what you're saying, Your Honor, but that doesn't mean that this court has ______.  I don't mean to be disrespectful. This court does not have jurisdiction to address the specific issue that they don't have a fair opportunity because they will be undercut in the markets. They will be undersold in the markets. That specific argument was not raised to the commission, so I don't know what the commission's answer to that would be. And if they had raised that to the commission, who knows? Maybe the commission might have made a different decision. I don't know. What about renegotiating the long-term contracts? At times in the briefing, it sounds like you propose that as a possible solution, and maybe it is. I don't understand how that would work if I'm on the other side of that contract, and you come to me, and you say, I would just like to pay less. It seems like I would just say no. Of course, and the commission acknowledged that. The commission itself specifically said at Rehearing Order Paragraph 40J612, the commission acknowledged that generators may not be successful in renegotiating those agreements. So that's why it then turned to the energy and capacity markets. And it explained, again, the specific provisions that set all that out. And I'll say that while Commissioner Clements did concur, concerned about whether these methods would work to the first order, she did not submit a concurrence to the Rehearing Order where the commission addressed all of these matters and presumably was satisfied with those answers. I promise to give you a couple minutes. Yes, I appreciate that. I appreciate that very much. I just wanted to hit the opportunity cost point. And just a little point, and I'm sorry if we're past that, but as the commission explained to the Rehearing Order JA605 Paragraph 29 and Note 92, operating a generating unit within the standard range does not affect the generation output of the unit. So they will sell the exact same amount of energy, whether they're providing in the standard range or not. There's no opportunity cost. There's only an opportunity cost if you're providing reactive power outside the standard range. Because it's just, I don't really understand why. There's some difference. I guess, yeah. And it really is for their own benefit. I think the court maybe understands that. Did the court find that it's for their benefit solely? The commission did find that. Solely for their benefit. It's solely for their benefit. If you look at, well, what it said was Reactive Power, it said Rehearing Order Paragraphs 53 to 54, JA621 to 22. And I've also marked down Initial Order Paragraph 62. The commission's point is that to maintain appropriate transmission through voltage levels within the standard range is to maintain appropriate voltage levels. I'm sorry. Which paragraph are you reading? Oh, yeah. I'm sorry. I'm not reading from a paragraph. I'm reading from my own notes. But it's Rehearing Order Paragraph 53 to 54, JA621 to 622. And then in the Initial Order Paragraph 62, JA419. And the commission's point is that when you provide it within the standard range, you're providing it to maintain appropriate transmission grid voltage levels to allow the real power to enter the grid. So the only purpose for that is so that you can enter the grid. And if you don't want to provide this reactive power. I don't see them saying that's the sole purpose of reactive power. I'm sorry. Otherwise, you wouldn't have these ranges, you know, at a minimum, right? These ranges are guesses. No, what the commission is saying is that. I'm just not seeing it. So to maintain appropriate. You have to have reactive power to get your stuff onto the grid for sure. That's the point. I don't see them saying that's exclusively what the reactive power obligations are for. That it doesn't also serve a large, within this range, it's not also serving larger purposes. It's not precisely tied to their output. It is absolutely precisely tied to their output. That's the whole range, the dead band range? No, you have to be able to be prepared. It's a capability requirement. You have to be prepared to provide it if it's needed when you inject onto the system. So it is absolutely related just to you injecting onto the system. This isn't something, if the transmission owner says we need you to provide additional reactive power outside the standard range to help us get things across the system, which is for the transmission owner's benefit, then you get compensated for that. I'm just not seeing it. It also gets back into this tension of why there's been all this payment for 20 something years. That's because of 2020. It's because of 2003's comparability standard. That's really why those payments have been made, not because there's been a fine. Paragraph 54 is the one that you read. Well, it's 53 to 54 and initial order paragraph 52. I also wrote down see also paragraph 23 to 24 on JA60102. And, you know, long-standing precedent supports this point. I say Bonneville, Eon, Southwest Power Pool, Michigan Electric, Detroit Edison, Arizona Public Service Commission, all of the company, all of those cases, you know, that's where the commission, that's where order 2003 came from, the older cases, and commission has consisted with that precedent. The whole basis is it's for your own benefit. And you don't have to provide it if you don't interconnect. That's the voluntariness. The voluntariness is you decide if you want to interconnect. This is a matter of an obligation so that you don't harm the system when you're injecting on. Thank you.  Good morning. Morning. I'd like to start by clearing up some of the misconceptions. And, you know, there's 20 years, 220 million has been thrown around a lot. But the key was in when Petitioner's Council said 2016. This is not in this particular record except in a presentation that the transmission owners attached to their answer to the protests of the original filing. The 2016, what changed? Technology had changed. So let me go back. Around the time of the unbundling, transmission owners owned generation, and they needed to divide the costs, the costs that were purely transmission, and the costs that were for this ancillary service. There are six ancillary services, but one of them is reactive. And there was a particular subset of costs, and that was the AEP allocation was how do we figure out how much of the cost of this plant should be dedicated to the capability to provide reactive. So that's where we start. And at the time, the Schedule 2 that was in the pro forma tariff said that we compensate for generators. Not, I mean, so it's in the transmission tariff, but to support the transmission system and the injection, the safe and reliable injection of generation, you need to have this bandwidth, this standard zone, I think is what Ms. Pichella called it. So that's where we start. And at that time, and Patricia's counsel mentioned, WIND wasn't required to provide reactive weeding and lagging, absorbing and producing, because they couldn't. The technology was such that they couldn't. And what had to happen instead, and I think her counsel alluded to, you have to do a study. You're going to hook up a generator. What do you have to do? One of the things that used to happen was for some of the renewables, they had to add equipment in their interconnection, and that's what provided the reactive support to inject their power. Fast forward in 2016, and this was in the Solar Energy Industries Association presentation that was attached to the transmission owner's answer. The technology had advanced, and these inverters, which were required to transform the real power or the power that they put out into AC power to put onto the grid. Also, as a byproduct, produced reactive power. So now they could be required. And FERC, in Order 827, said renewables, wind and solar, you are required to stay within that bed band, that 0.95 to 0.95, as close to unity as you can get it to provide the voltage support. And P.S., I'm no engineer, but I have heard reactive power likened to the foam on beer, a head of foam. The transmission, like a trampoline wall that pushes back and keeps the power in balance. It is a slightly different form of electric energy. Traditionally, the synchronous resources, thermal, you had to back off your production of real power to produce reactive. And that was part of the rationale for getting paid for it, was you had to literally give up some real power to produce reactive. You said there's six ancillary services. For the other five, whatever they are, do generators get compensation for those? There is one that is – well, one that has been added occasionally, which is generator imbalance, where they have to pay – if they schedule, say, I'm going to flow 100 megawatts, but they only flow 95, they have to supply the extra five. Are those ancillary services things that they have? They're not all for generators. Reactive, I think, is the one that generators supply. Generators were doing this division. Transmission, when FERC – Order 888, FERC unbundled – I thought you said – okay. Yeah, no, sorry. Transmission owners had generators, and they had to divide for purposes of Schedule 2. There were six ancillary services. I thought it was for their generation. Is that true or not true? No, it's for transmission. Six ancillary services that are needed to support transmission. Schedule 1 is scheduling. Three is frequency response, which has to do with the frequency of the electric – I'm not an engineer, but this is a test. But no, they're all related to transmission, and reactive support is related to transmission. But crucially, Schedule 2 is just the generator piece of it. There are other ways to get paid for reactive when you're outside the dead band when you're not a generator. But the key was that generators are required to keep it within that dead band to safely inject their power. So, that is related to their interconnection. And because at the time of 2003, transmission owners had generation, they were paying that generation, FERC said, well, to be comparable, if you're paying your own generation, you should pay other generations. And that was how, for the last 21 years, the MISO tariff has worked. But it wasn't until 2016 and Order 827 that suddenly we had all these renewables submitting revenue requirements, saying this is what I would like to be paid under Schedule 2, which says the transmission provider, MISO, will collect the money and disperse it according to those revenue requirements. But that's not the charge. The Schedule 2 charge is for the reactive service that transmission owners need. Okay. Any questions? Thank you very much for that helpful explanation. Thank you. And Mr. Tice will give you three minutes. Thank you, Your Honor. I will try to be brief. Just a few quick points. Number one, just ending where we're picking up where my friend just left off, there are five other ancillary services. I think the key point to know about those is all that essentially MISO provides. MISO has to provide these services to customers. But the difference between those services and reactive power is that all other five are voluntary for the compensation or for the generator to provide or not as they see fit, and all five are compensated. Reactive power is the exception. Number two, with respect to recovering costs through other means, I would point to page 66 of our brief, where we did preserve the argument, and we point to where we preserve the argument below, that this discrimination, as you pointed out, Judge Millett, is going to affect our bids in other markets, even if we are facially equalized at the Schedule II level. That doesn't mean that our costs of recovery are the same. Can you help me understand? Is this a transition issue because you're locked into contracts for the next number of years, or is this a permanent issue going forward? I think it's both, Your Honor. I think there are long-term power purchase agreements. On the transition, just give me a sense of how bad you think that problem is. Is it a one-year problem? Is it a five-year problem? As I understand it, power purchase agreements can be very lengthy, 10, 15, 20 years. And so presumably some of those power purchase agreements are going to be in effect for a long time. Beyond that, just investments in general. It's bilateral contracting, power purchase agreements, investors who fund new generation resources did so, and the parties agreed on a certain amount of compensation, knowing that currently they had rates on file that would be there until Section 206 filing, finding them unreasonable. So it's not that they expected to see them in perpetuity. It's that they expected to at least have the 206 right preserved. I get that. What I'm not getting is once we're past whatever transition period is relevant. Beyond that point, it's the point that Judge Millett mentioned, which is that transmission owners who are vertically integrated historically and independent generators are differently situated for purposes of recovering rates. It used to be that everybody could recover their rates through this ancillary service reactive power charge. Unfortunately, now that that is gone, we have no obvious means to recover, perhaps through capacity market offers, but that would make us uncompetitive with the transmission owners who don't have to recover their costs that way. Transmission owners can recover their costs through retail rates, assuming state commissions approve them. So that's going to be an ongoing discrepancy. Sorry, I guess I'm just not understanding that. The costs are what they are, and when you're selling power as an independent, your competitor who's integrated is selling power. Those transactions might be regulated by state commissions, or you're just competing in the market. But part of the cost of doing this is the cost of producing reactive power to get the energy from your generator to the consumers. Whoever is selling is going to have to take that into account, and whoever is buying is going to have to take that into account. I think that would be right, Your Honor, if we're all selling into the same market. I think the key here is that we're talking about two different markets. There's MISO, which requires the provision of reactive power service. That service is purchased by transmission customers, mostly transmission owners and others. Local utilities, right? Yes, local utilities, exactly, moving power to end users. Separately, so it used to be that both local utilities and generators could recover their costs through the ancillary service charge. Now nobody can, but the transmission owners can recover those costs by selling to end consumers, so they will be able to charge higher rates. We don't sell directly to end users, so that discrepancy will stay. They're integrated, they own the downstream distributor as well as upstream generator. That's right. The transmission owners, the legacy utilities prior to essentially Order 888, so they're more vertically integrated. Okay, but that retail sale, I assume, is going to be regulated by some state commission, which is going to say, okay, this is a legitimate cost or it's not, right? If it's the same cost as producing the power, it's going to get counted once. If it's a different cost, it's going to get counted twice. Someone's going to decide what is the appropriate price for a service that includes the need to have enough reactive power to get the good onto the transmission. I think that's right, Your Honor. I think the record showed that it's easier to have state regulators approve these sorts of costs. I think our broader point is that there's really no evidence in the record submitted by the transmission owners on this point. This was a one-sided record, as Commissioner Danley noted. One point I think that maybe is a better answer to all of your questions is that in the Notice of Proposed Rulemaking that FERC itself put out, it says on – I'm looking at the Federal Register site, but it's Federal Register 89, Fed Reg 21465. It says, we seek comments on whether, and if so, how, the elimination of separate reactive power payments will affect generating facilities' ability to recover their costs in the markets that currently provide reactive power compensation. They also seek comment on whether separate compensation will affect investment decisions to build or finish building generation facilities. So even FERC now is treating this as an open question. I'll point out that the Notice of Proposed Rulemaking, although we disagree with many of the factual findings, is quite interesting, and that it also asks things like about reliance interest, about the transition period, whether that's necessary, whether this would affect reliability. So again, the idea that they say, we didn't need any evidence because this is already all settled, I think is totally maligned by this Notice of Proposed Rulemaking. Very quickly on that phase-in point, I think our – they said we waived the argument that there should be a phase-in. I don't think that's true. At page JA142, we specifically mention a stakeholder process would have allowed a grandfathering period of legacy resources. I think in general, our 206 argument is essentially saying, leave our rates alone, even if you're going to change it going forward. So even if not – Brian specifically argued on JA396 for a phase-in period to FERC. Right. Which FERC did not address that argument. Very – I don't have that in front of me. EDF and ORSTED. I take it, yes. Those are protest filings. Yes, okay. Beyond that, it's not really, I don't think, our job in a 205 filing to propose, you know, things that won't hurt us quite as much. I think our job was to say this is an illegal filing. So one other quick point, Your Honor, which is that – Let me just clarify. I agree. Assume we think that something like this could be filed with 205. No, you disagree. And assume we think you're not entitled to this setup in perpetuity. We could still, rule in your favor, vacate and remand on the grounds that the reliance question was not appropriately addressed by FERC. And on remand, they need to deal with that. Absolutely, Your Honor. If FERC doesn't dispute the vacater, it would be the proper remedy. So that is – that would be the appropriate if you were to determine that they had failed to establish that it's just and reasonable. A final quick point is just that FERC emphasizes Section 9.6.3 of our agreement. Very often, they say we agreed to this and waived our rights. FERC counsel did not fully quote the entire provision of 9.6.3, which is that reactive power will be compensated pursuant to a tariff filed by the transmission provider, MISO, and approved by FERC. That was the point that was left out. And approved by FERC. I think that language alone suggests that any filing would have to comply with the Federal Power Act. Because FERC cannot, by definition, approve one that violates it. So I don't think there's anything in this language. Certainly no explicit waiver. And nothing in this language that suggests that we are somehow ceding our 205 rights or 206. FERC has to do so. And it would just be extraordinary, ultimately, if this were affirmed because then, as Judge Millett, I think you mentioned, tariffs could be written going forward to allow a sort of kill switch. That would say it doesn't matter if you spent years lodging all your cost-based revenue requirements on file. We can cut it off with a Section 205 filing. And, by the way, we don't even need to look at any evidence of just and reasonable rates. All right. Thank you very much for both counsel. The case is submitted.
judges: Millett; Katsas; Walker